# IN THE UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF ILLINOIS
# EASTERN DIVISION

| | | |
|---|---|---|
| MEDEFIL, INC., et al., | ) | |
| | ) | |
| Plaintiffs, | ) | No. 13-cv-04773 |
| | ) | |
| v. | ) | Judge Andrea R. Wood |
| | ) | |
| SCIENTIFIC PROTEIN LABORATORIES, LLC, et al., | ) | |
| | ) | |
| Defendants. | ) | |

## MEMORANDUM OPINION AND ORDER

Plaintiff Medefil, Inc. ("Medefil") manufactures and sells pre-packaged USP Heparin Lock Flush Syringes ("Heparin Lock Syringes") used to flush intravenous lines. During 2007 and 2008, Medefil purchased Heparin Sodium USP for its syringes from Scientific Protein Laboratories LLC ("SPL"). SPL, in turn, obtained crude heparin to manufacture its product from Changzhou SPL Company, Ltd. ("CZSPL"). In March 2008, SPL notified Medefil that it was voluntarily recalling one of its Heparin Sodium lots due to contamination. Medefil then notified its own customers that it was recalling its Heparin Lock Syringes manufactured from SPL's contaminated lot. In October 2010, SPL recalled a second lot of Heparin Sodium due to contamination. Again, Medefil initiated its own recall of its Heparin Lock Syringes that used the contaminated product.

Medefil and its insurer Federal Insurance Company (together, "Plaintiffs"), subsequently filed this lawsuit against SPL and CZSPL (together, "Defendants"), claiming that in addition to the damage and destruction of Medefil's products, Medefil has incurred significant costs and expenses defending lawsuits nationwide due to the contaminated syringes. The Amended Complaint includes several counts: Strict Liability (Count I), Breach of Contract (Count II),

Breach of Express Warranty (Count III), Breach of Implied Warranty of Merchantability (Count IV), Breach of Implied Warranty of Fitness for Particular Purpose (Count V), Negligence (Count VI), Fraud (Count VII), and Common Law Indemnification (Count VIII). Defendants have filed a motion to dismiss Counts I, VI, VII, and VIII, and to strike Plaintiffs' demands for punitive damages and attorneys' fees. (Dkt. No. 28.) For the reasons provided below, Defendants' motion to dismiss is granted as to Counts I, VI, and VIII. Those counts are dismissed with prejudice. Plaintiffs also will not be permitted to seek as damages the costs of defending litigation brought by third parties. Defendants' motion to dismiss is denied as to Count VII, however, as is their motion to strike the demand for punitive damages.

## BACKGROUND

The following facts are taken from the Amended Complaint and accepted as true.[1] Medefil manufactures pre-packaged Heparin Lock Flush Syringes, which contain Heparin Sodium USP as the active pharmaceutical ingredient ("API"). (Am. Compl. ¶ 18, Dkt. No. 27.) Medefil started purchasing Heparin Sodium USP from SPL for use in its syringes in 2002. (*Id.* ¶ 19.) In 2007, Medefil sent additional purchase orders for Heparin Sodium USP to SPL, listing the amount to be purchased and the expected shipment date. (*Id.* ¶ 20.) Defendants then shipped Heparin Sodium USP in various lot numbers to Medefil. Each shipment included a packing slip certificate of analysis, certifying lab testing of the Heparin Sodium USP and providing an invoice for the product. (*Id.* ¶ 23.)

Starting in February 2008, Baxter Health Care Corporation ("Baxter") began to recall products containing Heparin Sodium USP from SPL. (*Id.* ¶ 30.) Upon learning of the recalls,

---

[1] For the purposes of the motion to dismiss, the Court accepts as true all well-pleaded allegations set forth in the Amended Complaint and draws all reasonable inferences in favor of Plaintiffs. *See Killingsworth v. HSBC Bank Nev., N.A.*, 507 F.3d 614, 618 (7th Cir. 2007).

2

Medefil contacted SPL to see if there were any problems with the Heparin Sodium USP lots that Medefil had purchased from SPL. (*Id*.) Plaintiffs allege that SPL "assured Medefil there were no problems with the Heparin Sodium USP purchased from SPL," and further that SPL made these assurances "[w]ithout proper and/or adequate research." (*Id*.) As a result, Medefil not only continued to manufacture and ship its syringes using the product provided by SPL, but it also assured its own customers that there were no problems with its syringes in light of the Baxter recall. (*Id*.)

On March 19, 2008, Defendants informed Medefil by letter that they were voluntarily recalling one of the lots of Heparin Sodium USP shipped to Medefil due to the presence of a contaminant. (*Id.* ¶ 31.) The letter referred to an "urgent Drug Recall" and stated that Medefil should "[s]top using these lots Immediately" and take immediate action to recover any products that were distributed using the contaminated API. (*Id*.) At this point, Medefil had manufactured over four million Heparin Lock Syringes from the contaminated lot and had already sold and shipped many of the syringes to its customers, which, in turn, had sold and shipped many of the syringes to their own customers. (*Id.* ¶ 32.) Starting on March 20, 2008, Medefil sent notices to its customers recalling the Heparin Lock Syringes manufactured from the contaminated lot. (*Id.* ¶ 33.)

On October 15, 2010, Defendants once again notified Medefil that they were recalling a lot of Heparin Sodium USP due to a trace amount of contaminant. (*Id.* ¶ 34.) By the time it was notified of the second recall, Medefil had already manufactured approximately three million Heparin Lock Syringes using the contaminated lot. (*Id.* ¶ 35.) On November 3, 2010, Medefil notified its customers that it was again voluntarily recalling additional Heparin Lock Syringes. (*Id.* ¶ 36.)

Medefil alleges that SPL processes and manufactures crude heparin and API heparin sodium at CZSPL, its Chinese manufacturing facility, and in Waunakee, Wisconsin. (*Id.* ¶ 11.) The crude heparin and API heparin sodium manufactured at CZSPL in China are distributed to pharmaceutical companies producing Heparin Sodium USP in the U.S. market. (*Id.* ¶ 12.) According to Medefil, the CZSPL facility never had been inspected by the FDA until after the 2008 heparin recall and it did not have a license from the Chinese FDA authorities to operate as a pharmaceutical manufacturer. (*Id.* ¶¶ 12-13.) CZSPL also obtained crude heparin from wholesale suppliers in China that were never inspected or audited and, as a result, CZSPL supplied contaminated heparin to SPL for use as a component ingredient in Heparin Sodium USP. (*Id.* ¶¶ 14-16.)

As a result of the conduct alleged in the Amended Complaint, Medefil claims that not only did it incur substantial costs in recalling its products, including maintaining and then destroying the products and overseeing the recall, but it also had to credit customers for recalled syringes and pay recall fees. (*Id.* ¶¶ 37, 39-40.) Certain customers chose to stop working with Medefil as a result of the recall, and it had to switch to other Heparin Sodium USP suppliers at an increased cost. (*Id.* ¶ 39.) Medefil also asserts that it was sued by "hundreds of claimants in state and federal courts throughout the country." (*Id.* ¶ 42.) Medefil tendered those claims to Federal Insurance Company under its general liability insurance policy, causing the insurer to incur significant costs and expenses in defending Medefil and causing Medefil to have to pay deductibles to Federal for the insurance coverage. (*Id.* ¶¶ 44, 46.)

## DISCUSSION

Under Federal Rule of Civil Procedure 8, a pleading must contain a "short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). In

considering a motion to dismiss for failure to state a claim, the Court "can choose to begin by identifying pleadings that, because they are no more than conclusions, are not entitled to the assumption of truth." *Ashcroft v. Iqbal*, 556 U.S. 662, 679 (2009). While legal conclusions can provide the framework of a complaint, they must be supported by factual allegations. *Id.* When evaluating the sufficiency of a complaint, this Court must "construe it in the light most favorable to the nonmoving party, accept well-pleaded facts as true, and draw all inferences in [Plaintiffs'] favor." *Reger Dev. LLC v. Nat'l City Bank*, 592 F.3d 759, 763 (7th Cir. 2010).

**I.  Economic Loss Doctrine**

Counts I and VI of the Amended Complaint assert common law tort claims against Defendants based on theories of strict liability and negligence. Both counts seek to hold Defendants liable for losses incurred due to the selling of defectively manufactured Heparin Sodium USP to Medefil, such as costs associated with the recall of Heparin Lock Syringes, amounts that would have been received from the sale of lots that had to be recalled, costs charged by customers to Medefil for the recalled product, insurance deductibles and increased cost of insurance, increased costs to purchase Heparin Sodium USP from other providers, loss of profits and sales, reimbursement for unused Heparin Sodium USP, and costs and expenses from defending litigation. Recovery of such damages, however, is barred by the economic loss doctrine.

Illinois adheres to the economic loss doctrine, which bars recovery for a strict liability or negligence claim based on a plaintiff's monetary loss incurred without a corresponding claim of injury to the plaintiff's person or property. *In re Chicago Flood Litig.*, 680 N.E.2d 265, 274-75 (Ill. 1997) (citing *Moorman Mfg. Co. v. Nat'l Tank Co.*, 435 N.E.2d 443, 450-52 (Ill. 1982)). In *Moorman*, the Illinois Supreme Court explained that "where only the defective product is

damaged, economic losses caused by qualitative defects falling under the ambit of a purchaser's disappointed expectations cannot be recovered under a strict liability theory . . . . [The Illinois Supreme Court's] conclusion that qualitative defects are best handled by contract, rather than tort, law applies whether the tort theory involved is strict liability or negligence." 435 N.E.2d 443 at 451. The *Moorman* rule is intended to limit the remedies available in tort law when the dispute is one that should be governed by contract law. "Contract law provides the proper remedy for disappointed commercial expectations, such as when a product is unfit for its intended use." *Am. United Logistics, Inc. v. Catellus Dev. Corp.*, 319 F.3d 921, 926 (7th Cir. 2003). Thus, recovery for such damages under tort theories is barred "even in the absence of an alternative remedy in contract." *2314 Lincoln Park W. Condo. Assoc. v. Mann, Gin, Ebel & Frazier, Ltd.*, 555 N.E.2d 346, 350 (Ill. 1990).

Illinois courts have recognized exceptions to the economic loss doctrine (1) where the plaintiff sustained personal injury or property damage from a sudden or dangerous occurrence; (2) where the plaintiff's damages are proximately caused by a defendant's intentional, false representation; and (3) where the plaintiff's damages are proximately caused by a negligent misrepresentation by a defendant in the business of supplying information for the guidance of others in their business transactions. *In re Chicago Flood*, 680 N.E.2d at 272 (citing *Moorman*, 435 N.E.2d at 450-52); *see also Catalan v. GMAC Mortg. Corp.*, 629 F.3d 676, 693 (7th Cir. 2011); *American United Logistics,* 319 F.3d at 926-28.[2] But none of the facts alleged in the Amended Complaint suggests that any of the recognized exceptions applies here. Instead, the costs outlined in the Amended Complaint fall squarely within the categories of economic losses

---

[2] In arguing that the first of these exceptions applies in this case, Plaintiffs improperly conflate the personal injury claims of others with the requirement for personal injury to the plaintiff.

properly covered by contract remedies rather than tort remedies—*i.e.*, disappointed commercial expectations relating to the loss of the product due to defects.

Plaintiffs argue that the sudden and dangerous exception applies here. First, they claim that the drug recall was "urgent" and needed to take place "immediately," as demonstrated by the drug recall notice provided to them by SPL. (Pls.'s Resp. at 5, Dkt. No 35.) Second, Medefil argues that this sudden and dangerous occurrence damaged their "other property" because it required them to destroy integrated Heparin Lock Syringes containing contaminated Heparin Sodium USP. (*Id.* at 6.)

The Court is not persuaded that the facts alleged here warrant invoking the "sudden and dangerous occurrence" exception. The damage identified by Plaintiffs does not constitute a personal injury or damage to "other property," which is a requirement for recovery under that exception. As Medefil was not the ultimate consumer of the Heparin Lock Syringes, it cannot argue that it suffered personal injury from use of the product. Medefil consequently argues that it suffered damage to "other property," since the contaminated Heparin Sodium USP was merely a component of the Heparin Lock Syringes, and it was required to destroy syringes as a result of the recall. The standard for determining whether "other property" is at issue is "whether the damaged property was part of an integrated system, such that the damaged property could not be separated from the 'product.'" *Id.* at 437. The economic loss doctrine is designed to "bar tort recovery when a defective product causes the type of damage one would reasonably expect as a direct consequence of the failure of the defective product." *Trans States Airlines v. Pratt & Whitney Canada, Inc.*, 682 N.E.2d 45, 58 (1997). The logical result of any defect in the Heparin Sodium USP provided by SPL to Medefil would be the failure of the Heparin Lock Syringes as a whole.

This is the kind of reasonably expected economic loss that is properly governed by contract law remedies. As a result, Counts I and VI must be dismissed.

## II. Indemnification and Litigation Costs

Plaintiffs argue that due to SPL's negligence in distributing and selling contaminated Heparin Sodium USP to Medefil, SPL should be held liable for all costs Plaintiffs paid or credited to customers due to the recall, all costs charged to Medefil by customers for recalled product, and all costs, expenses, and fees associated with defending claims in the various personal injury lawsuits against it. Plaintiffs seek to recover such litigation costs, first, by means of an independent claim for common law indemnification in Count VIII of the Amended Complaint and, second, as damages in connection with the common law tort and contract-based claims alleged in Counts I through VII.

The request for litigation costs under the common law indemnification theory alleged in Count VIII is clearly barred by the Illinois Supreme Court's decision in *Kerns v. Engelke*, 390 N.E.2d 859 (1979).[3] That case expressly contemplated a plaintiff properly sued by a third party as strictly liable then seeking to recover the fees and costs it spent defending itself in that litigation from what it considered to be the primarily negligent party. The *Kerns* court begins by noting that, "[t]he law in Illinois clearly is that absent a statute or a contractual agreement 'attorney fees and the ordinary expenses and burdens of litigation are not allowable to the successful party.'" *Kerns*, 390 N.E.2d at 865 (quoting *Ritter v. Ritter*, 46 N.E.2d 41, 43 (1943)). While this Court agrees with Plaintiffs that their claims do not strictly fall within the parameters of the "American Rule," which bars an award of attorneys' fees to the prevailing party in same action, the *Kerns* court specifically considered reimbursement for attorneys' fees resulting from defending a ***prior*** action

---

[3] As a federal court applying Illinois state law, this Court is obliged to follow the Illinois Supreme Court's interpretation of its own state law. *Heidelberg v. Ill. Prisoner Review Bd.*, 163 F.3d 1025, 1027 (7th Cir. 1998) (citing *R.A.V. v. City of St. Paul*, 505 U.S. 377 (1992).

involving ***third parties***, finding as follows:

> We are not persuaded we should create an indemnity exception to the *Ritter* holding even under the circumstances of this case in which [the Counter-Plaintiff] gave [the Counter-Defendant] sufficient notice, and was ostensibly entitled to indemnification. [The Counter-Plaintiff] was properly sued as a defendant strictly liable; and that [the Counter-Plaintiff] was successful in the indemnity action is not a distinction sufficient to remove him from the ruling in *Ritter*.

*Id.* While there may be an exception for negligence that is the direct cause of the legal expenses, this exception would not apply if the indemnity plaintiff was "properly subject to suit by the injured party." *Sorenson v. Fio Rito*, 413 N.E.2d 47, 53 (Ill. Ct. App. 1980); *see also Riley Acquisitions, Inc. v. Drexler*, 946 N.E. 2d 957, 968 (Ill. App. Ct. 2011) ("Pursuant to *Kerns*, defendant here cannot recover her attorney fees and costs from CCS under a theory of indemnification.").

*Kerns* considered a claim for indemnification. The court in that case did not expressly reach the question of whether a plaintiff may recover attorneys' fees as consequential damages resulting from a defendant's tortious actions or breach of contractual obligations or duties. So while Plaintiffs' stand-alone indemnification claim in Count VIII is plainly barred by *Kerns* and must be dismissed, it is less clear whether Plaintiffs should be permitted to recover litigation costs from other actions as damages resulting from Defendants' conduct as alleged in the other counts.[4] However, the Illinois Appellate Court decision in *Riley* expressly rejects the recasting of a claim for attorneys' fees from an indemnification claim to a breach of contract or duty claim as a means

---

[4] Indeed, in *Fednav International Ltd. v. Continental Insurance Co.*, 624 F.3d 834 (7th Cir. 2010), the Seventh Circuit, in dicta, suggests that such attorneys' fees might be recoverable under Illinois law "'where the wrongful acts of a defendant involve the plaintiff in litigation with third parties or place him in such relation with others as to make it necessary to incur expenses to protect his interest.'" *Id.* at 840 (quoting *Ritter*, 46 N.E.2d at 44). The *Fednav* court goes on, however, to explain that this exception is rooted in the theory that "a tortfeasor should be held responsible for all of the natural and proximate consequences of his actions." *Fednav*, 624 F.3d at 840 (internal quotations omitted). For reasons discussed above, Plaintiffs' tort claims in this case have been dismissed, leaving only contract-related claims. Thus, the *Fednav* dicta does not appear to be a perfect fit for the present scenario either.

of avoiding the holding in *Kerns*. *See Riley*, 946 N.E.2d at 967-68 ("Defendant attempts to avoid the application of this long-standing rule by characterizing her attorney fees and costs as damages that she incurred as a result of [the] breach. … Yet this specific argument on similar facts was addressed and rejected by the Supreme Court in *Kerns*."). Putting aside *Kerns*, this recent authority from the Illinois Appellate Court is the state court precedent most directly on point. *See Tricontinental Indus., Ltd. v. PricewaterhouseCooopers, LLP*, 475 F.3d 824, 836 (7th Cir. 2007) (in the absence of controlling authority from the state supreme court, a federal court is obliged to follow the interpretation of the state appellate court). Not only is Count VIII dismissed but Plaintiffs also will be precluded from recovering costs from third-party litigation as damages for their surviving claims.

### III. Fraud

Federal Rule of Civil Procedure 9(b) provides that "[i]in alleging fraud or mistake, a party must state with particularity the circumstances constituting fraud or mistake. Malice, intent, knowledge, and other conditions of a person's mind may be alleged generally." Fed. R. Civ. P. 9(b). "Parties pleading fraud in federal court, must state the time, place and content of the alleged communications perpetuating the fraud." *Graue Mill Dev. Corp. v. Colonial Bank & Trust Co.*, 927 F.2d 988, 992 (7th Cir. 1991). Under Rule 9(b), the plaintiff must state "the identity of the person who made the misrepresentation, the time, place, and content of the misrepresentation, and the method by which the misrepresentation was communicated to the plaintiff." *Uni*Quality, Inc. v. Infotronx, Inc.*, 974 F.2d 918, 923 (7th Cir. 1992). "Specificity requirements may be relaxed, of course, when the details are within the defendant's exclusive knowledge." *Jepson, Inc. v. Makita Corp.*, 34 F.3d 1321, 1328 (7th Cir. 1994).

In Count VII of the Amended Complaint, Plaintiffs allege that in February 2008, representatives from SPL, including certain specified individuals,[5] represented to Medefil that "the Heparin Sodium USP sold to Medefil was free of contamination and would not be recalled" and that "[Medefil] had nothing to worry about despite the Baxter recalls." (Am. Compl. ¶ 91, Dkt. No. 27.) The Amended Complaint further asserts that

> SPL knew, or should have known, that there were problems, including possible contamination, with the Heparin Sodium USP sold to Medefil. Even before the recalls, SPL had concerns about the quality of the crude heparin coming from China. It was also aware of and had implemented tests for at least one other customer that would have identified the presence of the contamination in the Heparin Sodium USP sold to Medefil.

(*Id.* ¶ 95.) The Amended Complaint states that SPL was "reckless in failing to properly investigate whether the Heparin Sodium USP SPL sold to Medefil was contaminated and would be recalled." (*Id.* ¶ 96.)

Plaintiffs have alleged the month and year of the alleged fraudulent statements, along with the identity of at least some of the individuals they claim were responsible for the fraud. That Plaintiffs allege that SPL "knew or should have known" there were problems does not defeat their claim given that a defendant's state of mind may be alleged generally under Rule 9(b) and that is the kind of information that is typically within a defendant's control and would only be available to a plaintiff through discovery. Plaintiffs also allege that SPL was performing tests of its Heparin Sodium USP during this time period that should have alerted it to the contamination, even if it had not been aware of the Baxter recall. These allegations are sufficient for the Amended Complaint to withstand a motion to dismiss. The motion to dismiss is therefore denied as to Count VII.

## IV. Punitive Damages and Attorneys' Fees

Because the fraud claim survives, so does Plaintiffs' request for punitive damages. "It has

---

[5] The Amended Complaint names Gregg Steinhauer, Michael Reardon, David Straunce, and Christine Kois from SPL as individuals who made representations to Medefil. (Am. Compl. ¶ 91, Dkt. No. 27.)

long been established in this State that punitive or exemplary damages may be awarded when torts are committed with fraud, actual malice, deliberate violence or oppression, or when the defendant acts willfully, or with such gross negligence as to indicate a wanton disregard of the rights of others." *Kelsay v. Motorola, Inc.*, 384 N.E.2d 353, 359 (1978). Plaintiffs have not identified any statutory or contractual basis for an award of attorneys' fees, however, and thus they are not allowed. *See Harter v. Iowa Grain Co.,* 220 F.3d 544, 557 (7th Cir. 2000). Accordingly, Defendants' motion to strike Plaintiffs' request for attorneys' fees from litigating this action is granted.

## CONCLUSION

For the reasons provided above, Defendants' motion to dismiss (Dkt. No. 28) is granted as to Counts I, VI, and VIII, and those counts are dismissed with prejudice. Plaintiff also will not be permitted to claim as damages the costs of defending litigation initiated against them by third parties; nor will they be permitted to recover their attorneys' fees in this action. Defendants' motion to dismiss is denied as to Count VII, however, as is their motion to strike the demand for punitive damages. Defendants shall answer or otherwise respond to Counts II, III, IV, and V of the Amended Complaint by July 24, 2015.

ENTERED:

Dated: June 26, 2015

_____
Andrea R. Wood
United States District Judge